# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

TRUENORTH COMPANIES, L.C.;
TRUENORTH PRINCIPALS, L.C.,

        Plaintiffs,

vs.

TRUNORTH WARRANTY PLANS OF
NORTH AMERICA, LLC,

        Defendant.

No. C17-31-LTS

**MEMORANDUM**
**OPINION AND ORDER**

## I.    INTRODUCTION

This case is before me on a motion (Doc. No. 62) for preliminary injunction and motion (Doc. No. 65) to exclude expert opinions, testimony and evidence by plaintiffs TrueNorth Companies, L.C., and TrueNorth Principals, L.C. (collectively TrueNorth). Defendant TruNorth Warranty Plans of North America, LLC (TN Warranty) has filed resistances to both, *see* Doc. Nos. 88 and 89, along with a sealed supplemental resistance. *See* Doc. No. 96.   TrueNorth has submitted replies.   Doc. Nos. 100 and 105.

Also before me are TN Warranty's motions (Doc. Nos. 90, 91) to amend/correct the protective order and extend pre-trial deadlines.   TrueNorth has filed resistances (Doc. Nos. 101 and 103) and TN Warranty has filed replies (Doc. Nos. 114 and 115).

I held a hearing on the motions on October 26, 2018, and allowed the parties to submit supplemental exhibits.   *See* Doc. Nos. 121, 122, 123.   TrueNorth followed up with a motion (Doc. No. 124) to strike the exhibits filed as Doc. Nos. 122-1, 122-2, and portions of Doc. No. 123-1.   TN Warranty filed a third set (Doc. No. 125) of supplemental exhibits and a resistance (Doc. No. 126) to TrueNorth's motion to strike. Finally, as if attempting to prove Yogi Berra's famous observation that "it ain't over till

it's over,"[1] TN Warranty has filed a motion (Doc. No. 127) for leave to supplement its resistance to TrueNorth's motion for preliminary injunction, which TrueNorth resists (Doc. No. 128).[2]

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Procedural Background

TrueNorth filed its original complaint (Doc. No. 2) on March 28, 2017, alleging two counts of trademark infringement, one count of mark dilution,[3] one count of false designation of origin and one count of mark infringement under Iowa law based on the parties' respective design logos:

Plaintiffs':



Defendant's:



---

[1] *See, e.g.,* https://en.wikipedia.org/wiki/Yogi_Berra

[2] The only other pending motion is TN Warranty's motion (Doc. No. 133) to compel that was filed on December 5, 2018, and has been referred to Judge Mahoney.

[3] On February 8, 2018, I granted TN Warranty's motion for judgment on the pleadings as to this claim and dismissed it with prejudice.   *See* Doc. No. 55.

On November 27, 2017, TrueNorth amended its complaint to add two new counts: Count VI for false advertising under the Lanham Act and Count VII for unfair competition under the Lanham Act and common law. The parties then submitted a joint motion (Doc. No. 47) for revised deadlines, which Judge Williams granted. *See* Doc. Nos. 47, 48. The order established July 9, 2018, as the deadline for disclosure of defendant's expert witnesses. *See* Doc. No. 48 at 3. This deadline was later extended to July 30, 2018. Doc. No. 61.

On August 20, 2018, TrueNorth filed its motion for a preliminary injunction and motion to exclude TN Warranty's expert. It seeks a preliminary injunction to stop TN Warranty from using any mark similar to the TrueNorth mark. TrueNorth alleges that since filing the lawsuit, it has received several communications from truck drivers and industry professionals demonstrating confusion about the affiliation between TN Warranty and TrueNorth. It also seeks to exclude TN Warranty's expert based on an alleged failure to disclose materials the expert relied upon under Rule 26(b)(4)(C).

## B.  *Nature of the Parties' Businesses*

TrueNorth was formed in August 2000 by the merger of three financial services entities. *See* Doc. No. 68 at 2. It provides financial and insurance services to a variety of clients nationwide including comprehensive property and casualty insurance, risk management and underwriting services. *Id.* at 2, 4. It also provides other specialized products and services to commercial transportation companies and individual drivers including transportation risk management, transportation property insurance and transportation equipment insurance. *Id.* TrueNorth originated in eastern Iowa and now has offices in Tennessee, Texas, Illinois, Michigan and Colorado.

TN Warranty was formed on September 1, 2015, to market and sell commercial truck warranties. *See* Doc. No. 88 at 4. Its products provide extended warranty services for mechanical components for used commercial vehicles manufactured by

others whose original manufacturer's warranty has expired.  *Id.* at 5.  It markets its services through a network of independent truck dealers or "authorized retailers," who purchase and resell its warranty products.  *Id.*  The end user of TN Warranty's products is a truck owner or fleet owner who owns the truck(s) covered by the warranties. *Id.*  TN Warranty estimates that approximately 80 percent of its authorized retailers are used truck dealers who sell TN Warranty products at the point of sale at or near the same time they close a deal for the sale of a used truck.  *Id.*  It estimates that approximately 15 percent of its warranties are sold by finance companies that provide the financing for the truck and approximately 5 percent of its warranties are sold by repair facilities.  *Id.* It states that in rare circumstances (a fraction of one percent of sales), TN Warranty sells a warranty directly to an end consumer.  *Id.* at 6.

TN Warranty has six sales representatives who work directly with its authorized retailers.  The representatives are assigned geographic regions and are encouraged to travel regularly to visit the authorized retailers in person.  *Id.*  TN Warranty relies heavily on word of mouth and invests substantial resources into making sure its sales team meets face-to-face with dealers and retailers to discuss and educate them about TN Warranty's products.  *Id.*  When recruiting new authorized retailers, TN Warranty states it makes in-person visits to explain, in detail, who it is, what it does and what it offers.  *Id.*  TN Warranty provides training to authorized retailers about its products and TN Warranty's expectations in selling its products.  *Id.* at 7.

TN Warranty advertises and markets its products to truck dealers.  *Id.*  It states its largest marketing investment is in travel for its sales representatives.  *Id.*  Additional marketing includes direct emails to authorized retailers, its website and branding and marketing at the annual gathering of the Used Truck Association.  *Id.*  Dealers around the country attend this event and not individual truckers.  *Id.* at 7-8.

TN Warranty states it does not market or sell insurance products.  *Id.* at 8.  It states that in training new authorized retailers, it emphasizes that it is not selling

insurance, but a limited warranty. It does not compete with providers of insurance products and does not market its warranty products through insurance brokers or agents. *Id.* It contends that neither it, nor its authorized retailers, have encountered TrueNorth in the marketplace. *Id.* TN Warranty states an authorized retailer has never contacted it inquiring about the association between the two entities. It is unaware of any other entities that market insurance to the end user in the same way that TN Warranty markets its products. The used truck dealers, finance managers or repair companies that TN Warranty works with and that sell its products do not also offer insurance. *Id.*

TN Warranty works directly with the authorized retailer when one of its products is sold. It invoices the authorized retailer and the authorized retailer pays TN Warranty. *Id.* The authorized retailer will pay for the cost of the warranty in one lump sum and often for a package of several different warranty products for different trucks at one time. A used truck dealer or finance company may finance the resale cost of the warranty with the price of the truck such that the customer may pay for the warranty through monthly payments. *Id.* at 9. All warranties require an inspection of the truck and TN Warranty's approval. TN Warranty may ask the authorized retailer to provide more information about a truck, such as a photo or a correction in the application prior to issuing a warranty.

Authorized retailers market TN Warranty's product to two classes of customers: large operators who have a fleet of trucks and independent owner/operators. Authorized retailers answer customer questions regarding the warranty options. *Id.* at 10. TN Warranty states that most customers are interested in coverage, cost and convenience rather than the provider of the warranty. *Id.*

## C.     History of the Parties' Marks

TrueNorth Principals, L.C. has three registered trademarks. Doc. No. 68 at 2. On December 11, 2001, it received Registration Number 2,517,502 for the logo below:



*Id.* at 3. On September 26, 2006, it received Registration Number 3,149,332 for the text "TRUENORTH." *Id.* On October 10, 2006, it received Registration Number 3,154,664, which covers TRUENORTH and the design shown below:



*Id.* TrueNorth Principals, L.C. issued exclusive licenses to use these trademarks to TrueNorth Companies, LLC. TrueNorth represents it has consistently used the word "TrueNorth" with the above logo designs since 2000. *Id.* at 4. It states it has invested over $30 million in marketing efforts to strengthen its brand locally and nationally. *Id.*

The history of TN Warranty's mark begins in 2015. Doc. No. 88 at 10. At that time, Carrbridge Berkshire Group, Inc. (Carrbridge) began marketing warranty products through its division Berkshire Fleet Services (Berkshire Fleet). The warranty products themselves were provided by CompassOne Warranty Plans of North America LLC (an offshoot of a family of companies under the umbrella The Compass Group, Inc., founded by William "Kirk" Eskridge in 2002). *Id.* at 11. Eskridge, who was the chief executive of Carrbridge, formed CompassOne Warranty in April 2015. *Id.* CompassOne Warranty used the following mark to market its warranty products.



*Id.* TN Warranty contends that from 2002 through 2012, The Compass Group, Inc. owned and used a Vector Compass mark created by a digital marketing firm hired by Compass Group. *Id.* It states that CompassOne Warranty's graphic was derived from the Vector Compass mark. *Id.* at 12.

On March 30, 2015, American Guardian Warranty Services, Inc. (American Guardian) filed a lawsuit against Carrbridge and Berkshire Fleet claiming that the use of the term "Compass" infringed on American Guardian's intellectual property rights. *Id.* American Guardian claimed it had been using its Compass mark since in or around 2005. Eskridge agreed to change the name and mark and ceased operating CompassOne Warranty.[4] *Id.* at 13.

On September 1, 2015, Eskridge formed TN Warranty. *Id.* It used the same Vector Compass mark as CompassOne to promote its products. It states it chose the name "TrüNorth" to pay homage to its CompassOne Warranty and Compass Group roots. *Id.* It chose to use a dieresis (ü) in its mark to give the brand an international feel, consistent with the company's international aspirations. *Id.* Thus, TN Warranty began using its "TRÜNORTH" mark and compass design (below) sometime in late 2015.

---

[4] TrueNorth points out that Eskridge did not stop using the CompassOne mark until after American Guardian had obtained a permanent injunction and Eskridge was ordered to by the United States District Court for the Northern District of Illinois following contempt proceedings. *See* Doc. No. 68 at 19-21; Doc. No. 62-2 at 78-79.



*Id.*

TN Warranty filed an application to register its mark with the United States Patent and Trademark Office (USPTO) on February 5, 2016. *Id.* at 14. On October 31, 2016, TrueNorth filed an opposition to the application. Doc. No. 68 at 5. On December 20, 2016, the USPTO issued a notice of default regarding TN Warranty's application because it failed to answer TrueNorth's opposition. *Id.* On February 16, 2017, the USPTO entered a judgment by default against TN Warranty, sustaining TrueNorth's opposition and denying TN Warranty's application for a trademark. *Id.*

**D.    *History of Dispute Between Parties***

In September 2015, TrueNorth learned of TN Warranty's mark when Joe Hoovestol of Lone Mountain Leasing in Carter Lake, Iowa, forwarded an email he had received from Rick VanHove, a Regional Sales Director for TN Warranty. Doc. No. 68 at 5. On January 19, 2016, TrueNorth sent a cease and desist letter to Eskridge, TN Warranty's CEO, demanding that TN Warranty stop using the word "TRÜNORTH" or the logo stating that it infringed on TrueNorth's marks. *Id.* On August 23, 2016, TrueNorth received an application for insurance from one of its clients in the trucking industry. *Id.* at 6. Among the forms submitted with the application included a Component Breakdown Limited Warranty Agreement form for TRÜNORTH™. *Id.* TrueNorth ultimately filed this action on March 28, 2017.

After TrueNorth filed suit, TN Warranty attempted to reach a negotiated arrangement but those efforts were not successful. *Id*. at 17. TN Warranty states that it then voluntarily redesigned its mark as follows:



.

*Id*. TN Warranty asserts that it began implementing this design in May 2018. It is displayed on its website (https://www.trunorthwarranty.com) and TN Warranty represents that it is in the process of using this design on all print and online marketing materials. *Id*.

TN Warranty provides additional background concerning a non-party, Gateway Management Services, Ltd., d/b/a Premium 2000+ (Premium 2000+), and its President and Chief Executive Officer, Lynn Murphy. *Id*. at 17. TN Warranty states that Murphy and Eskridge were business partners at one time but are now rivals and competitors. *Id*. It alleges that Murphy (and affiliates) have filed various lawsuits against Eskridge and his affiliates. *Id*. at 18-19. With regard to this lawsuit, TN Warranty claims that Premium 2000+ has offered to do business with TrueNorth, but has cited TN Warranty's name and mark as a "road block" to doing business. *Id*. at 20 (citing Doc. No. 85-9 consisting of emails from Premium 2000+'s attorney to counsel for TrueNorth). *See also* Doc. No. 123-1 (excerpts from Murphy's deposition). Essentially, TN Warranty contends that this evidence suggests that TrueNorth's lawsuit is premised more on Murphy's animosity towards Eskridge rather than on true confusion in the marketplace. *See id*. at 17-22.

TrueNorth has provided a detailed summary of emails and phone calls[5] it has received from truck drivers and professionals within the trucking and insurance industries that allegedly demonstrate confusion in the marketplace between TN Warranty and TrueNorth. *See* Doc. No. 68 at 6-10. It contends these communications speak for themselves and that Premium 2000+ has nothing to do with TN Warranty's own actions in choosing a mark or the alleged, resulting harm to TrueNorth. *See* Doc. No. 105 at 15-16.

### E.    *TN Warranty's Expert Disclosures*

TrueNorth's other motion (Doc. No. 65) concerns TN Warranty's expert, Christopher King. TrueNorth states that with respect to damages, it relies on an unjust enrichment/profit disgorgement theory pursuant to 15 U.S.C. § 1117(a). TrueNorth alleges that an "Expert Rebuttal Report on Damages" authored by King and disclosed by TN Warranty reveals that much of the information King relied upon to form his opinions was not provided to TrueNorth in discovery and was not included with TN Warranty's expert disclosures. *See* Doc. No. 65 at 2. TrueNorth argues TN Warranty is required to produce the information under Federal Rule of Civil Procedure 26(a)(4)(C). *Id.* at 2-3. TrueNorth claims that it has been prejudiced by TN Warranty's refusal to produce the information because its own expert is unable to rebut that opinion without the underlying information. It requests that King's opinions and testimony be excluded. *Id.* at 3-4.

TN Warranty states it had legitimate and serious concerns regarding confidentiality when it produced King's expert report, which is why it withheld commercial and financial information in connection with that report. Doc. No. 89 at 1. It states that it proposed creating additional confidentiality safeguards before producing the information and

---

[5] TrueNorth did not start recording calls until January 2018. It collected 24 recordings in the six-month period prior to filing its motion for preliminary injunction. Doc. No. 105 at 6.

extending the deadline for TrueNorth to depose King and submit any rebuttal expert report. *Id.* at 2. TN Warranty contends this information is purely supplemental and therefore, its disclosure timely. To the extent it is not supplemental, it contends that any delay is substantially justified by its confidentiality concerns. *Id.*

TN Warranty's alleged confidentiality concerns stem from its history with Premium 2000+ and Murphy. *Id.* at 3-9. TN Warranty states that it is concerned that any financial information produced through this case may be leaked to Premium 2000+, which TN Warranty fears Premium 2000+ would then use against it. *Id.* at 9. TN Warranty states that Eskridge even refused to turn over TN Warranty's financial records to King, TN Warranty's own expert witness, based on his fear that the records would make their way to Premium 2000+. *Id.* TN Warranty explains that when it submitted King's expert report, it notified TrueNorth about its confidentiality concerns. *Id.* at 10. TN Warranty notes that Premium 2000+ has been a subject of this litigation throughout discovery. *Id.*

Prior to serving King's expert report, TN Warranty states that it conferred with opposing counsel by phone about its confidentiality concerns regarding Premium 2000+. Counsel for TrueNorth stated that it was contemplating filing a motion to compel or motion to exclude. *Id.* at 11. After this phone call, TN Warranty's counsel considered moving to amend the Protective Order.[6] However, TrueNorth filed its motion to exclude 10 days after counsels' phone call. *Id.* Eskridge then provided the financial records to King so he could supplement his opinion on TN Warranty's profits from the sale of its warranty products during the relevant time period. *Id.* TN Warranty states that Eskridge agreed to turn over these documents only if the Protective Order was amended to prohibit Randall Rings (Secretary and General Counsel for TrueNorth) from having access to the information. *Id.*

---

[6] TN Warranty filed its motion to amend the protective order on September 21, 2018, after TrueNorth filed its motion to exclude on August 20, 2018.

TN Warranty acknowledges it has not yet produced the financial records, but intends to do so, along with the supplement to the King report. *Id.* at 12. It states that four days after TrueNorth filed its motion to exclude, TN Warranty proposed, via letter, a resolution to the discovery dispute in the form of additional protections for the financial documents. *See* Doc. No. 89-10. TrueNorth rejected that proposal via letter on September 6, 2018. *See* Doc. No. 89-11. TN Warranty asked TrueNorth to reconsider and submitted a proposed revised protective order. *See* Doc. No. 89-12. The proposed amendment consists of an additional category of information titled "Highly Confidential Plus Material." *Id.* It specifically seeks prohibiting disclosure to the non-producing party and in-house counsel of the non-producing party. *Id.* TrueNorth rejected the proposal that day.

## III.   APPLICABLE STANDARDS

### A.   *Preliminary Injunction*

The purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The Lanham Act authorizes a preliminary injunction in favor of the owner of a registered trademark. 15 U.S.C. 1116(a). The Eighth Circuit relies on the *Dataphase* factors to determine whether to issue a preliminary injunction with regard to conduct that allegedly violates the Lanham Act. *See United Industries Corp. v. Clorox Co.*, 140 F.3d 1175, 1179-84 (8th Cir. 1998). These factors are:

1. the threat of irreparable harm to the movant
2. the state of the balance between this harm and the injury that granting the injunction will inflict on other parties
3. the probability that the movant will succeed on the merits
4. the public interest

*Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). While no single factor is dispositive, the Eighth Circuit has stated that

"likelihood of success on the merits is most significant." *Laclede Gas Co. v. St. Charles Cnty., Mo.*, 713 F.3d 413, 419 (8th Cir. 2013) (quoting *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995)). In evaluating the factors, I must "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999). "The party seeking injunctive relief bears the burden of proving all the *Dataphase* factors." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

**B.      *Expert Witness Disclosures***

Federal Rule of Civil Procedure 26(b)(4)(C) provides:

(C) *Trial-Preparation Protection for Communications Between a Party's Attorney and Expert Witnesses.* Rules 26(b)(3)(A) and (B) protect communications between the party's attorney and any witness required to provide a report under Rule 26(a)(2)(B), regardless of the form of the communications, except to the extent that the communications:

(i) relate to compensation for the expert's study or testimony;

(ii) identify facts or data that the party's attorney provided and that the expert considered in forming the opinions to be expressed; or

(iii) identify assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed.

Fed. R. Civ. P. 26(b)(4)(C). There is also a duty to supplement expert disclosures:

(2) Expert Witness. For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

Fed. R. Civ. P. 26(e)(2).

A party's violation of the discovery rules may result in a sanction under Rule 37(c)(1), which provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court on motion and after giving an opportunity to be heard:
>
> > (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> >
> > (B) may inform the jury of the party's failure; and
> >
> > (C) may impose other appropriate sanctions, including any of the order listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1).

## IV. DISCUSSION

### A. The Post-Hearing Motions

#### 1. Motion to Strike Supplemental Exhibits

At the time of oral argument, TN Warranty had a pending motion (Doc. No. 117) for leave to file a supplemental declaration and TrueNorth had a pending motion (Doc. No. 118) for leave to file additional exhibits. During the hearing, TN Warranty referenced additional deposition transcripts that had just become available and requested to supplement the record. I granted the motions and allowed the parties to submit any other supplemental evidence referenced during the hearing by October 30, 2018. *See* Doc. No. 120.

TrueNorth submitted multiple sealed exhibits that TN Warranty produced the day before the hearing. *See* Doc. No. 121. These documents consist of various communications related to previous trademark applications from Eskridge's companies, including TN Warranty. *Id.* TrueNorth also submitted excerpts from depositions of

Chad Thurm, senior vice president of TrueNorth's transportation division, and Rings, TrueNorth's corporate designee. *Id.*

TN Warranty also submitted deposition excerpts from Thurm and Rings in addition to Lynn Murphy, corporate designee of Gateway/Premium 2000+ and Jacob Pipkin, team leader for TrueNorth's transportation division. *See* Doc. No. 122. Additionally, it submitted its PowerPoint presentations for the pending motions, answers to interrogatories and communications between counsel. *Id.* It also requested that in the event the court issues a preliminary injunction, that it require TrueNorth to post a bond pursuant to Federal Rule of Civil Procedure 65(c).

TrueNorth then filed an objection and motion (Doc. No. 124) to strike three exhibits submitted by TN Warranty. These include: TN Warranty's PowerPoint presentations, and portions of Murphy's deposition. TrueNorth argues that the deposition excerpts relate to the motion to exclude, rather than the motion for preliminary injunction and that supplemental evidence was limited to the motion for preliminary injunction.

On October 31, 2018, TN Warranty submitted another supplement (Doc. No. 125) including final versions of the Pipkin deposition excerpts and exhibits referenced in the Murphy and Rings depositions or in TN Warranty's reply brief in support of its motion to amend the protective order. It further submitted exhibits from the depositions of Todd Amen and Thurm. On November 2, 2018, TN Warranty filed a resistance (Doc. No. 126) to TrueNorth's motion to strike.

Clearly, I do not consider TN Warranty's PowerPoint presentations to be actual evidence. With regard to the excerpts from Murphy's deposition, TN Warranty argues these excerpts are relevant to both motions. I did not specify at the hearing whether the supplemental exhibits referenced by the parties had to relate solely to the motion for preliminary injunction. Indeed, the hearing was set for both motions, *see* Doc. No. 106, but time constraints allowed me to hear only arguments as to the motion for

preliminary injunction. TN Warranty referenced Murphy's deposition during its argument. I will consider the Murphy deposition excerpts to the extent they are relevant to either motion. TrueNorth's motion (Doc. No. 124) to strike is denied.

### 2. TN Warranty's Motion to Supplement Resistance

On November 13, 2018, 18 days after the preliminary injunction hearing, TN Warranty moved to supplement its resistance to show that TrueNorth did not, as it has claimed, send a second cease and desist letter to TN Warranty. Doc. No. 127. TrueNorth resists but acknowledges that – despite numerous representations to the contrary – no such letter was sent. Doc. No. 128. Having reviewed the parties' filings, I have no doubt that TrueNorth's prior representations were wrong, but not intentionally so. It is clear that the purported second letter, supposedly sent on September 13, 2016, was actually sent to a different entity that was allegedly using TrueNorth's mark. *See, e.g.,* Doc. No. 128 at 1, ¶ 3. Because this error was not discovered and brought to TN Warranty's attention until after the injunction hearing, I will grant TN Warranty's motion (Doc. No. 127) to supplement its resistance to the motion for preliminary injunction.

### B. The Motion for Preliminary Injunction

While likelihood of success on the merits is often described as the most significant factor in a preliminary injunction analysis, a failure to show irreparable harm may be dispositive. Therefore, I will start my analysis there. *See Roudachevski v. All-American Care Centers, Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) ("Even when a plaintiff has a strong claim on the merits, preliminary injunctive relief is improper absent a showing of a threat of irreparable harm."); *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 n.5 (8th Cir. 2008) (en banc) ("[I]n some cases, lack of irreparable injury is the factor that should begin and end the . . . analysis."); *Watkins*

*Inc.*, 346 F.3d at 844 (lack of irreparable harm is "an independently sufficient ground upon which to deny" an injunction). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Economic loss is not irreparable harm as long as losses are recoverable, but loss of intangible assets, such as reputation and goodwill, are, even though they are difficult to quantify. *Id.* (citing *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) and *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 426 (8th Cir. 1996)). "To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015).

### 1.    *Is There a Presumption of Irreparable Harm?*

The parties disagree over whether there is a presumption of irreparable harm based on evidence of a likelihood of confusion. TrueNorth argues that irreparable harm may be presumed if it shows a likelihood of consumer confusion. *See* Doc. No. 68 at 27. TN Warranty argues that after the Supreme Court's decision in *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), irreparable harm cannot be presumed. Doc. No. 88 at 27. In *Winter*, the Supreme Court stated: "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). The Court emphasized that the standard requires a movant to demonstrate that "irreparable injury is *likely* in the absence of an injunction." *Id.* (emphasis in original).

Two years earlier, in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), the Court rejected a "general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances." *Id.* at 391. The Court emphasized that district courts must apply the traditional four-factor test in determining whether to award injunctive relief. *Id.* at 394. As noted by the District of Minnesota, "[t]he Supreme Court has not clarified . . . and the Eighth Circuit has yet to address, whether a presumption of irreparable harm still applies in trademark cases following *eBay* and *Winter*." *Buffalo Wild Wings Intern., Inc. v. Grand Canyon Eq. Partners, LLC*, 829 F. Supp. 2d 836, 845 (D. Minn. 2011).

Other courts have interpreted *Winter*, in conjunction with the Supreme Court's decision in *eBay*, to mean that a plaintiff may not rely on a presumption to establish this irreparable harm, but must make a showing as required for all other factors. *See, e.g.*, *Ferring Pharms., Inc. v. Watson Pharms, Inc.*, 765 F.3d 205, 214-17 (3d Cir. 2014) (discussing *Winter* and *eBay* and holding that "a party seeking a preliminary injunction in a Lanham Act case is not entitled to a presumption of irreparable harm but rather is required to demonstrate that she is likely to suffer irreparable harm if an injunction is not granted."); *Herb Reed Enterprises, LLC v. Florida Entertainment Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013) (holding that "the *eBay* principle – that a plaintiff must establish irreparable harm – applies to a preliminary injunction in a trademark infringement case."); *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1228-29 (11th Cir. 2008) ("Because the language of the Lanham Act – granting federal courts the power to grant injunctions 'according to the principles of equity and upon such terms as the court may deem reasonable' – is so similar to the language of the Patent Act, we conclude that the Supreme Court's *eBay* case is applicable to the instant case.").

Without additional guidance from the Eighth Circuit on this issue, I find it prudent to consider irreparable harm under the traditional analysis (requiring plaintiff to show more than a possibility of harm), without allowing for a presumption based on likelihood

of success.   *See Salinger v. Colting*, 607 F.3d 68, 75-82 (2d Cir. 2010) (discussing *eBay* and concluding that likelihood of success on the merits in copyright infringement case does not raise presumption of irreparable harm).   I find this to be consistent with Eighth Circuit precedent requiring the movant to demonstrate that the harm is "certain and great," *see Powell*, 798 F.3d at 702, and that failure to show irreparable harm is, by itself, sufficient to deny a preliminary injunction.   *See Rounds*, 530 F.3d at 732 n.5; *Watkins Inc.*, 346 F.3d at 844.   This approach is also consistent with that taken by other district courts in this circuit.   *See Cy Wakeman, Inc. v. Nicole Price Consulting, LLC*, 284 F. Supp. 3d 985, 994 n.5 (D. Neb. 2018) (disagreeing that irreparable harm may be presumed upon a finding of likelihood of success on the merits in a copyright case); *Southeast X-Ray, Inc. v. Spears*, 929 F. Supp. 2d 867, 872 (W.D. Ark. 2013) (concluding it will make no presumptions as to irreparable harm); *C.S. McCrossan Const., Inc. v. Minnesota Dept. of Transp.*, 946 F. Supp. 2d 851, 859 (D. Minn. 2013) ("The Court perceives no obvious reason why *eBay* should not extend to this case – the Court need not, and should not, presume irreparable harm to [plaintiff] simply because it may have been involved in a 'flawed' MNDOT bidding process.").   *But see Buffalo Wild Wings Intern., Inc.*, 829 F. Supp. 2d at 845 n. 6 (citing cases in the District of Minnesota that have recognized a presumption post *eBay*).

### 2.    Has TrueNorth Shown Irreparable Harm?

TN Warranty argues that TrueNorth cannot demonstrate irreparable harm because: (1) it waited 17 months to seek a preliminary injunction and (2) its evidence is speculative and inadmissible.   TrueNorth argues that delay does not preclude relief and explains that it filed its motion as soon as it had sufficient evidence of irreparable harm.   Doc. No. 105 at 18-19.   It further contends that its evidence from Todd Amen, owner of American Truck Business Services, is admissible and establishes that TrueNorth is suffering irreparable harm to its ability to control its reputation.

TrueNorth argues it faces irreparable harm to its reputation by TN Warranty's use of its name. Doc. No. 68 at 27. It notes that TN Warranty has received negative consumer reports from the Better Business Bureau and Trucker's Report (an online forum used by truck drivers). TrueNorth states that truck drivers frequently complain about TN Warranty denying claims and that negative customer reviews have a significant impact on TrueNorth because truck drivers believe that TN Warranty products come from TrueNorth. It further notes that some if its trucking industry partners have contacted TrueNorth on behalf of drivers with warranty claims in an attempt to resolve warranty issues. *Id*. TrueNorth relies on Amen's report, phone calls and email exchanges in support of its claim that it will suffer irreparable harm absent entry of a preliminary injunction. *See* Doc. Nos. 62-1 at 25, 104-06.

TrueNorth explains that its delay in seeking a preliminary injunction stems from an increase in calls about warranties that it received in 2018. *See* Doc. No. 105 at 19. TrueNorth started recording calls in January 2018 due to the "increasing number of calls and other instances of confusion among TrueNorth customers." Doc. No. 97 at 6. TrueNorth recorded six calls in February 2018, four calls in March 2018, one call in April 2018, three calls in May 2018, no calls in June 2018, two calls in late July 2018 and six calls in August 2018. *Id*. at 7. At the hearing, TrueNorth emphasized that the irreparable harm is to its reputation and goodwill in that customer dissatisfaction with TN Warranty is being directed at and attributed to TrueNorth. Following the hearing, TrueNorth submitted excerpts from Rings' deposition in which he described the damage to TrueNorth's reputation with Lone Mountain Leasing as follows: "Just verbal communications that have been relayed to me that they think that the presence of having su[ch] a similar logo is creating challenges and confusion that is disruptive to our working together to market to owner operators and truck lessees." *See* Doc. No. 121-8 at 6-7. Rings went on to further describe the situation as creating challenges with how TrueNorth tries to market to leasing companies and that continuing to have this be a discussion topic

is disruptive to business. *Id.* Rings could not provide any specific examples and was not aware of any specific loss of business with Lone Mountain. *Id.*

After reviewing all the evidence and supplemental evidence submitted by the parties, I find that TrueNorth has failed to demonstrate irreparable harm. This factor requires a party to show that "the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski*, 648 F.3d at 706. TrueNorth alleges that it suffers reputational harm and the ability to control its reputation and goodwill based on TN Warranty's mark and name. While TrueNorth has demonstrated some level of confusion through phone call recordings and email communications, it has not demonstrated any irreparable harm (such as loss of customers or decline in sales) based on this confusion. *See* Doc. No.123-2 at 90 ("Q: Are plaintiffs aware of any sales that they claim to have been diverted from them to TNWarranty? A: No, specific sale, only the disruption to our calling stream."). While TrueNorth employees have to spend time addressing confusion and explaining that TrueNorth provides insurance services and not warranty services, this type of harm can be addressed through monetary means. *See Grasso Enterprises, LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) ("It is well established that irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages.") (internal quotation omitted).

With regard to whether the alleged harm is "great," TrueNorth does not provide any context regarding how many calls its customer service representatives receive in a day. TN Warranty has submitted excerpts from the deposition of Pipkin, who testified that each of the 28 to 30 individuals who take calls in TrueNorth's call center receive 25 to 30 calls per day (and up to 100 calls per day during peak season). *See* Doc. No. 123-3 at 7-10, 27-28. Six calls per month is hardly so disruptive that TrueNorth is suffering irreparable harm that cannot be addressed through monetary means.

TrueNorth has also failed to demonstrate that the alleged harm is more than a possibility. *See Brady v. Nat'l Football League*, 640 F.3d 785, 794 (8th Cir. 2011) (stating harm "must be actual and not theoretical."). While I appreciate that reputational damage can constitute a threat of irreparable harm, *see Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003), and is difficult to measure, I find that TrueNorth has not made a sufficient showing that such harm is likely absent a preliminary injunction. *See Winter*, 555 U.S. at 22 (stating the movant must "demonstrate that irreparable injury is *likely* in the absence of an injunction") (emphasis in original)). TrueNorth argues that its reputational damage stems from (1) customers who are upset about their warranties and (2) industry partners who have commented on TN Warranty's presence. TrueNorth does not sell truck warranties. When customers call TrueNorth complaining about their truck warranties, TrueNorth informs them it does not sell or service warranties, but is in the insurance business.

While there is possibility that these upset TN Warranty customers tell fellow truck drivers to avoid business with "True North" or fail to go to TrueNorth for insurance based on a negative impression stemming from their warranty, the record lacks any evidence to suggest that this is more than a speculative possibility and is negatively affecting TrueNorth's business in an irreparable way. *See Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) (upholding denial of preliminary injunction based in part on speculative nature of harm and 17-month delay in pursuing injunctive relief); *In re Travel Agency Comm'n Antitrust Litig.*, 898 F. Supp. 685, 689 (D. Minn. 1995) ("[A]n injunction cannot issue based on imagined consequences of an alleged wrong. Instead, there must be a showing of imminent irreparable injury.").

Aside from the individual callers, the only other entities TrueNorth references in showing harm to its reputation are Lone Mountain Leasing (which alerted TrueNorth to TN Warranty's logo) and Premium 2000+ (which competes with TN Warranty and has

its own arguable agenda for pursuing business with TrueNorth).[7]   As noted above, Rings testified that Lone Mountain Leasing communicated that it thought the presence of having a similar logo was "creating challenges and confusion that is disruptive to our working together to market to owner operators and truck lessees."   Doc. No. 121-8 at 6-7. Rings could not identify anything more specific other than "it's a topic that comes up in conversation and creates challenges with how . . . we go to market to try to sell to . . . that segment."   *Id.* at 7.   Rings stated he was not aware of any lost business with Lone Mountain as a result of this issue.   *Id.* at 8.

With regard to Premium 2000+, Rings testified that Premium 2000+ was pursuing a business relationship with TrueNorth, but discontinued that in March 2017, when it specifically referenced TN Warranty and cited confusion in the marketplace. Doc. No. 123-2 at 92-94.   However, he also stated that TrueNorth had never determined that it wanted to do business with Premium 2000+.   *Id.*   Murphy also testified that TrueNorth was the one who alerted him to the purported confusion, yet Murphy is the one who sought out TrueNorth regarding a business relationship with the arguable intention of teaming up against Eskridge.   *See* Doc. No. 119 at 2 ("Q: Other than those instances that Mr. Pipkin or someone at TrueNorth Iowa discussed with you, do you have any other personal knowledge of confusion in the marketplace?   A: Not to my recollection."); Doc. No. 125-1 (emails exchanged between Murphy and another Premium 2000+ employee and Pipkin regarding setting up a business relationship with TrueNorth targeted at Eskridge).   Premium 2000+ and Murphy's reason for declining to do business with TrueNorth is questionable based on the record.   *See* Doc. No. 125-1 at 5 (stating in an email from Murphy to another Premium 2000+ employee on March 6, 2017, "[h]ope [TrueNorth] gets[s] serious about laying Eskridge away.   They will need to before we can do anything with them!").   The harm to TrueNorth's reputation

---

[7] Rings also mentioned Zurich in his deposition.   However, he offered little detail and testified that the relationship was "the same" as far as he knew.   Doc. No. 123-2 at 111-12.

based on these limited examples appears to be non-existent and certainly nothing more than a possibility. TrueNorth has demonstrated only that its affiliates have acknowledged the presence of another entity named "True North."

This is not True North's first experience dealing with an entity with an identical name. *See* Doc. No. 85-10 (listing other registered "True North" marks). Indeed, TrueNorth has previously entered into Co-Existence Agreements with two other "True North" entities – one providing financial consulting services to large banks and credit reporting agencies and the other providing advertising and public relations services. *See* Doc. Nos. 96 and 105 at 14. These agreements state the parties have concluded their respective uses of "True" and "North" and trademarks are "in separate industries, targeting distinct groups of consumers, via separate channels of trade, and therefore [are] not likely to cause confusion." Doc. No. 96-1. TrueNorth's willingness to co-exist with other entities using the same name, albeit in arguably different industries, tends to lessen the alleged harm.

TrueNorth's delay in seeking relief also weighs against a finding of irreparable harm. While delay does not preclude relief, it does suggest that the harm is not imminent or great. *See Iowa Utils. Bd.*, 109 F.3d at 425 (8th Cir. 1996) ("a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."). "Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985); *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894 (8th Cir. 2013) (citing *Citibank* with approval); *see also GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984) (holding that when a movant shows "no specific harm other than the harm that is presumed to exist when there is a likelihood of confusion, movant's delay in bringing suit is an important factor in determining irreparable harm."). As TN

24

Warranty points out, TrueNorth waited 17 months after filing its complaint in March 2017 to bring its motion for preliminary injunction. The delay is even longer if measured from the time TrueNorth learned of TN Warranty in September 2015. TrueNorth's only explanation for the delay was that it was collecting sufficient evidence to support its motion. If the harm was truly as serious, imminent and irreparable as alleged, TrueNorth should not have needed 17 months to bring a properly supported motion. With trial scheduled to begin just seven months away (and the dispositive motion deadline a couple weeks away based on the current scheduling order), I find the harm that TrueNorth complains of is more appropriately resolved on the merits.

The Eighth Circuit has repeatedly recognized that "[f]ailure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Grasso Enterprises, LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)). Because I am not convinced that the alleged harm here is irreparable, imminent, great or sufficiently likely for the reasons stated herein, I decline to issue a preliminary injunction.

### C. *Motion to Exclude TN Warranty's Damages Expert*[8]

#### 1. *Overview of Events*

The relevant timeline is as follows:

| | |
|---|---|
| August 16, 2017 | The court approves and enters the parties' stipulated protective order (Doc. No. 36).[9] |
| May 4, 2018 | TrueNorth timely identifies its expert witnesses, providing expert reports and disclosing the information required by Federal Rule of Civil Procedure 26(b)(4)(C). One of TrueNorth's experts, Eric |

---

[8] TN Warranty's motion (Doc. No. 90) to amend the protective order and motion (Doc. No. 91) to extend deadlines, is essentially a response to TrueNorth's motion (Doc. No. 65) to exclude TN Warranty's expert. I will consider all three motions in this section.

[9] The Stipulated Protective Order describes two levels of confidentiality - "confidential" and "highly confidential," which is limited to review by counsel, including in-house counsel.

|                | Engstrom, is a damages expert who provided opinions based on TN Warranty's reported sales.   At this time, TN Warranty's expert witness disclosure deadline was July 9, 2018.   *See* Doc. No. 48. |
| -------------- | --- |
| June 15, 2018  | The parties file a joint motion (Doc. No. 57) to extend certain deadlines, including TN Warranty's expert witness deadline.   The motion contains no indication that TN Warranty is concerned about any potential violation of the protective order and intends to withhold information. |
| June 22, 2018  | An order (Doc. No. 59) is entered that, *inter alia*, extends TN Warranty's expert witness disclosure deadline to July 23, 2018. |
| July 17, 2018  | TN Warranty files an unresisted motion (Doc. No. 60) for a further extension of deadlines, including its expert witness deadline. Again, this motion contains no indication that TN Warranty is concerned about any potential violation of the protective order and intends to withhold information. |
| July 19, 2018  | An order (Doc. No. 61) is entered that, *inter alia*, extends TN Warranty's expert witness disclosure deadline to July 30, 2018. |
| July 30, 2018  | TN Warranty serves its expert disclosures, including disclosures concerning King, a damages expert who provides opinions that respond to Engstrom's opinions by describing various costs TN Warranty incurred in generating its sales revenues.   *See* Doc. No. 69 at 6-57.   At this time, TrueNorth's deadline for disclosing rebuttal expert information was August 31, 2018.   Doc. No. 61. |
| August 20, 2018 | After various communications between counsel concerning TN Warranty's withholding of certain information relating to King's opinions, TrueNorth files its motion to exclude expert opinions, testimony and evidence concerning King.   Doc. No. 65. |
| Sept. 21, 2018 | TN Warranty files a resistance to the motion to exclude expert opinions and a motion to amend the protective order to provide that certain information could be designated in such a manner as to prevent its disclosure to the receiving party's in-house counsel. Doc. Nos. 90, 91. |

## 2. *TN Warranty's Withholding of Information*

It is undisputed that on July 30, 2018, when disclosing expert witness information, TN Warranty withheld financial information relevant to the issue of damages. TrueNorth states when TN Warranty submitted King's expert report, it expressed concerns that TrueNorth was colluding with one or more third parties and would not abide by the protective order. Doc. No. 65 at 2. TrueNorth assured TN Warranty it was committed to complying with the protective order and requested that TN Warranty produce financial and cost information, along with all other information required by Rule 26 and that TrueNorth had previously requested. TN Warranty continued to withhold the information. *Id.* at 3.

TN Warranty's alleged confidentiality concerns stem from its history with Premium 2000+ and Murphy. *Id.* at 3-9. TN Warranty states that it is concerned that any financial information produced through this case may be leaked to Premium 2000+, which TN Warranty fears Premium 2000+ would then use against it. *Id.* at 9. TN Warranty states that Eskridge even refused to turn over TN Warranty's financial records to King, TN Warranty's own expert witness, based on his fear that the records would make their way to Premium 2000+. *Id.* TN Warranty explains that when it submitted King's expert report, it notified TrueNorth about its confidentiality concerns. *Id.* at 10. TN Warranty notes that Premium 2000+ has been a subject of this litigation throughout discovery. *Id.*

Prior to serving King's expert report, TN Warranty states that it conferred with opposing counsel by phone about its confidentiality concerns regarding Premium 2000+. Counsel for TrueNorth stated that it was contemplating filing a motion to compel or motion to exclude. *Id.* at 11. After this phone call, TN Warranty's counsel considered moving to amend the Protective Order.[10] However, TrueNorth then filed its motion to

---

[10] TN Warranty filed its motion to amend the protective order on September 21, 2018, after TrueNorth filed its motion to exclude on August 20, 2018.

exclude. *Id.* At that point, Eskridge provided the financial records to King so he could supplement his opinion on TN Warranty's profits from the sale of its warranty products during the relevant time period. *Id.* TN Warranty states that Eskridge agreed to turn over these documents only if the Protective Order was amended to prohibit Randall Rings (Secretary and General Counsel for TrueNorth) from having access to the information. *Id.*

TN Warranty acknowledges it has not yet produced the financial records, but intends to do so, along with a supplement to the King report. *Id.* at 12. It states that four days after TrueNorth filed its motion to exclude, TN Warranty proposed, via letter, a resolution to the discovery dispute in the form of additional protections for the financial documents.[11] *See* Doc. No. 89-10. TrueNorth rejected that proposal via letter on September 6, 2018. *See* Doc. No. 89-11. TN Warranty asked TrueNorth to reconsider and submitted a proposed revised protective order. *See* Doc. No. 89-12. The proposed amendment consists of an additional category of information titled "Highly Confidential Plus Material." *Id.* It specifically seeks prohibiting disclosure to the non-producing party and in-house counsel of the non-producing party. *Id.* TrueNorth rejected the proposal that day.

TN Warranty contends that it proposed a reasonable solution by suggesting certain confidentiality provisions be added to the protective order at which point it would produce the requested information and agree to extend the deadline for TrueNorth to depose King and submit any expert rebuttal report. Doc. No. 89 at 2. TN Warranty further contends that King himself did not review the contested financial information at issue before drafting his expert report, which includes the following statement:

> I did not review tax returns or similar financial documents because TNWarranty was unwilling to provide them as a result of concerns they

---

[11] TrueNorth notes that TN Warranty's proposed resolution regarding an amendment to the protective order and extension of deadlines was not made until August 24, 2018, nearly a month after TN Warranty failed to produce the documents and after TrueNorth filed its motion to exclude. *See* Doc. No. 100 at 3.

have that Plaintiffs, who as I understand it are believed to be working closely with one or more of TNWarranty's competitors to harm TNWarranty, including through this litigation would not abide by the terms of the Protective Order in this case with respect to maintaining the confidentiality of documents designated as confidential or highly confidential. As such I am relying on the representations made to me with regard to certain financial information contained in this report. In the event that additional information is subsequently made available to me, I will supplement this Report accordingly.

Doc. No. 70 at 5.[12]

TrueNorth points out that TN Warranty had substantial time to seek a court-approved amendment to the protective order before its expert disclosure deadline. *See* Doc. No. 103 (noting that TrueNorth asked for information concerning TN Warranty's revenue, profits and expenses in its first Request for Production of Documents and that TN Warranty's responses date January 16, 2018, state that it was refusing to provide that information because it was "highly confidential proprietary," disproportionate to the needs of the case and premature because TN Warranty intended to move to bifurcate liability from damages).[13] TrueNorth argues that TN Warranty's chosen method of addressing its concerns violated the scheduling order and the disclosure obligations imposed by Rule 26(b)(4)(C).

---

[12] TrueNorth disputes that the withheld information is solely supplemental. *See* Doc. No. 100 at 2. Following the submission of King's original report, TrueNorth noted it was missing several documents King said he had considered, but TN Warranty had not produced, and that were responsive to TrueNorth's previous requests for production. *See* Doc. No. 65-2 at 3-4; Doc. No. 103-2 at 21-22.

[13] On February 23, 2018, TN Warranty did provide some responsive information consisting of a spreadsheet listing revenue received from selling warranties. Doc. No. 103 at 2. TrueNorth followed up on March 7, 2018, seeking documents related to profits or expenses that TN Warranty would use to offset its revenue. *Id.* at 2-3 (citing Doc. No. 103-3). It agreed to wait for this information as part of TN Warranty's expert disclosures since it would be TN Warranty's burden to prove deductions to its revenue for purposes of disgorgement. *Id.*

### 3.  *Applicable Legal Standards*

Federal Rule of Civil Procedure 26(a) states as follows, in relevant part:

*(2)   Disclosure of Expert Testimony.*

>    (A)   *In General.*   In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.

>    (B)   *Witnesses Who Must Provide a Written Report.* Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

>>    (i)    a complete statement of all opinions the witness will express and the basis and reasons for them;

>>    (ii)   the facts or data considered by the witness in forming them;

>>    (iii)  any exhibits that will be used to summarize or support them;

>>    (iv)   the witness's qualifications, including a list of all publications authored in the previous 10 years;

>>    (v)    a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

>>    (vi)   a statement of the compensation to be paid for the study and testimony in the case.

>>                 *        *        *

>    (D)   *Time to Disclose Expert Testimony.*   A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made:

        (i)      at least 90 days before the date set for trial or for the case to be ready for trial; or

        (ii)     if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure.

     (E)   *Supplementing the Disclosure.*   The parties must supplement these disclosures when required under Rule 26(e).

Fed. R. Civ. P. 26(a)(2).   Federal Rule of Civil Procedure 37(c)(1) provides:

If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.   In addition to or instead of this sanction, the court on motion and after giving an opportunity to be heard:

     (A)   may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

     (B)   may inform the jury of the party's failure; and

     (C)   may impose other appropriate sanctions, including any of the order listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1).   In deciding whether to apply a sanction pursuant to Rule 37(c)(1), I must consider (1) the reason for noncompliance, (2) the surprise and prejudice to the opposing party, (3) the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial and (4) the importance of the information or testimony in determining an appropriate sanction or remedy.   *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008).

### 4.    Analysis

If TrueNorth prevails on the merits at trial, it seeks damages pursuant to 15 U.S.C. § 1117(a), which allows a successful plaintiff "to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." The statute directs that "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a); *see also Tonka Corp. v. Tonk-A-Phone, Inc.*, 805 F.2d 793, 794 (8th Cir. 1986). Thus, TrueNorth has to prove TN Warranty's revenues and TN Warranty then has to prove any costs that should be deducted to calculate its profits. Consistent with this statutory allocation of the respective burdens, TrueNorth's expert (Engstrom) has provided revenue opinions based on sales information produced by TN Warranty. Doc. No. 65 at 2, ¶ 2; Doc. No. 69 at 1-5. Engstrom reached conclusions concerning TN Warranty's gross revenue, deducted claims paid by TN Warranty and arrived at a "net amount." Doc. No. 69 at 1.

Pursuant to Section 1117(a), TN Warranty has retained King to provide opinions as to costs or other amounts that should be deducted from TN Warranty's revenues to determine TN Warranty's profits. The problem is that as of its expert disclosure deadline of July 30, 2018, TN Warranty had not even provided its own expert with the financial information he needed to arrive at final opinions. Thus, as King wrote in his report, he had to rely "on the representations made to me with regard to certain financial information contained in this report." Doc. No. 69 at 10, ¶ 11. Only after TrueNorth filed its motion to exclude did TN Warranty provide King with the actual financial information necessary for him to prepare a final (or "supplemental," as TN Warranty calls it) report. As noted above, TN Warranty has yet to provide this information to TrueNorth, despite the requirements of Rule 26 and the fact that TrueNorth specifically requested such information in October 2017. *See* Doc. No. 103-1.

There is no doubt that TN Warranty violated the expert disclosure requirements of Rule 26(a)(2) by failing to produce the financial information its own expert must rely upon to form opinions concerning "all elements of cost or deduction claimed" pursuant to Section 1117(a). In deciding whether sanctions are appropriate, I must consider whether TN Warranty's actions were substantially justified and harmless. They were not substantially justified. TN Warranty's excuse for withholding documents is based on Eskridge's alleged concern that TrueNorth (and particularly its in-house counsel, Rings) would violate the court's protective order by sharing documents with third parties. If counsel for TN Warranty believed Eskridge had a legitimate concern that could be supported with evidence, then TN Warranty could have and should have sought relief from the court long before July 30, 2018. Such relief could have included (a) a motion for further extension of the expert disclosure deadline and (b) a motion to amend the protective order to include additional protections (much like the motion TN Warranty finally filed nearly two months later).

Instead, TN Warranty engaged in extra-judicial self-help, taking it upon itself to decide what information to disclose while holding other evidence hostage in an effort to force TrueNorth to agree to its terms. This conduct is particularly egregious in light of the lack of evidence supporting Eskridge's alleged concern. Eskridge supposedly believed that Rings, a licensed attorney,[14] would violate the protective order (and put his career at risk) by leaking highly confidential information to a third party – Premium 2000+. TN Warranty argues that the risk of disclosure by Rings is high because he is on the board of managers and is the corporate secretary for each TrueNorth entity. *See* Doc. No. 115 at 5. TN Warranty contends that its refusal to disclose information, and subsequent motion to amend the protective order, was precipitated by concerns that TrueNorth was in discussions with Premium 2000+, TN Warranty's competitor and

---

[14] I take judicial notice of Iowa court records demonstrating that Rings has been licensed to practice law in Iowa since 1996 and has not been subject to any disciplinary action. *See* https://www.iacourtcommissions.org/icc/ViewLawyer.do?id=10856.

business rival.    TN Warranty cites portions of Murphy's deposition on October 4, 2018, in which Murphy described meetings between Premium 2000+ and TrueNorth during which TN Warranty was a topic of conversation.    *Id.* at 2-3.    Excerpts from that deposition also reveal Murphy's animosity towards Eskridge.    *Id.* at 3-4.

None of this supports TN Warranty's purely-speculative concern that Rings might violate the existing protective order.    Nor does it justify TN Warranty's intentional disregard of this court's scheduling order and brazen, dilatory conduct.    TN Warranty and its counsel exercised incredibly poor judgment in electing to violate the scheduling order and disregard TN Warranty's expert disclosure obligations without even attempting to obtain relief from the court.    TN Warranty's non-compliance was not substantially justified.

Nor was it harmless.    As TrueNorth points out, its rebuttal expert disclosure deadline was August 31, 2018.    Given that TN Warranty did not produce the actual financial information it apparently relies upon to support the amount of "all elements of cost or deduction claimed" pursuant to Section 1117(a), TrueNorth's expert could not possibly have studied the necessary data and provided rebuttal opinions by that date (or, for that matter, by today's date).    The *only* factor that weighs in TN Warranty's favor here is that trial is not scheduled to begin until July 2019 – seven months from now. Thus, ample time remains to cure the harm TN Warranty has caused.    This will begin with TN Warranty's almost-immediate production of King's "supplemental" expert report, along with all of the information required by Rule 26(b) with regard to that report.[15]

---

[15] TN Warranty's invocation of Rule 26(e) to call King's forthcoming report a "supplemental" report is incorrect.    Rule 26(e) creates a "limited exception" that "permits supplemental reports only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report." *Minebea Co., Ltd. v. Papst*, 231 F.R.D. 3 (D.D.C. 2005); *see also Wells v. Lamplight Farms, Inc.* 303 F.R.D. 530, 535-38 (N.D. Iowa 2014). Here, the financial information necessary for King to prepare a "supplemental" report was "available."    TN Warranty just chose not to provide it.

Thus, I find that TN Warranty's failure to disclose the financial information necessary to evaluate "all elements of cost or deduction claimed" pursuant to Section 1117(a) was neither substantially justified nor harmless. As such, its conduct is sanctionable. While this finding would permit exclusion of all or part of King's testimony at trial, I have discretion to impose other sanctions "[i]n addition to or instead of this sanction." Fed. R. Civ. P. 37(c)(1). One alternative sanction is an order directing "payment of the reasonable expenses, including attorney's fees, caused by the failure." Fed. R. Civ. P. 37(c)(1)(A). I find this remedy, along with adjustments to the scheduling order as set forth below, to be appropriate to address TN Warranty's non-compliance.[16]

## V.     CONCLUSION

For the reasons stated herein:

1.     TrueNorth's motion (Doc. No. 62) for preliminary injunction is **denied**.

2.     TrueNorth's motion (Doc. No. 65) to exclude expert opinions, testimony and evidence is **granted in part** and **denied in part**, as follows:

a.     The motion is **denied** to the extent that it seeks entry of an order excluding expert opinion, testimony and evidence.

b.     However, pursuant to Federal Rule of Civil Procedure 37(c)(1)(A), the motion is **granted** with regard to the alternative sanction of an award of TrueNorth's reasonable expenses, including attorney's fees. TrueNorth shall submit, on or before **January 4, 2019**, an itemized statement, with supporting evidence, reflecting the reasonable expenses, including attorney's fees, it incurred due to TN Warranty's failure to provide timely expert witness disclosures pursuant to Federal Rule of Civil Procedure 26. TN Warranty may file a response on or before **January 18, 2019**, and TrueNorth

---

[16] I further find that TN Warranty has not shown good cause for either (1) amending the protective order or (2) waiting until long after its expert disclosure deadline to file a motion to amend the protective order. As such, its motion (Doc. No. 90) will be denied.

may file a reply on or before **January 25, 2019**. Upon review of the parties' submissions, I will determine whether oral argument is appropriate.

3.      TN Warranty's motion (Doc. No. 90) to amend the protective order is **denied.**

4.      TN Warranty's motion (Doc. No. 91) to extend deadlines is **granted**. The new deadlines are as follows:

| | | |
|---|---|---|
| a. | Defendant's "Supplemental" Expert Witness Report for Christopher King: | **December 17, 2018** |
| b. | Plaintiffs' Rebuttal Expert Witnesses: | **January 18, 2019** |
| c. | Completion of Expert Discovery: | **February 8, 2019** |
| d. | Dispositive Motions: | **March 1, 2019** |
| e. | Trial Ready: | **July 1, 2019** |

5.      TrueNorth's motion (Doc. No. 124) to strike exhibits is **denied**.

6.      TN Warranty's motion (Doc. No. 127) for leave to supplement its resistance to the motion for preliminary injunction is **granted**.

7.      Trial remains scheduled for **July 8, 2019**.

**IT IS SO ORDERED.**

**DATED** this 7th day of December, 2018.

_____
Leonard T. Strand, Chief Judge