# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| TRUENORTH COMPANIES, L.C.;<br>TRUENORTH PRINCIPALS, L.C., | ) | |
| | ) | **No. 17-cv-31-LTS** |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | **DEFENDANT TNWARRANTY'S** |
| | ) | **RENEWED MOTION TO COMPEL** |
| TRUNORTH WARRANTY PLANS | ) | **DISCOVERY** |
| OF NORTH AMERICA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

COMES NOW Defendant TrüNorth Warranty Plans of North America, LLC ("TNWarranty"), by its undersigned counsel, and hereby renews its motion to compel Plaintiffs TrueNorth Companies, L.C. and TrueNorth Principals, L.C.,[1] to produce documents and answer interrogatories pursuant to Federal Rule of Civil Procedure 37(a)(3)(B), and states:

## FACTUAL AND PROCEDURAL BACKGROUND

1.     TNWarranty filed a Motion to Compel Discovery on December 5, 2018 ("MTC").

2.     By order dated December 19, 2018, the Court, after holding a telephonic hearing on the matter, held TNWarranty's MTC in abeyance and ordered "the parties to further meet and confer on the motion to compel." (Dkt. 144.)[2]

3.     Over the ensuing weeks, the parties have further met and conferred on the motion to compel, exchanging correspondence on December 27, 2018 (Dkt 142-1); January 8, 2019 (Dkt 142-4); January 18, 2019 (Dkt. 148, ¶ 3); January 28, 2019 (Dkt 150, ¶ 2); February 1, 2019

---

[1] Plaintiff TrueNorth Principals, L.C. owns the trademark that it licenses to Plaintiff TrueNorth Companies, L.C. ("TrueNorth") for use to market and promote TrueNorth's products and services.
[2] Plaintiffs filed a motion to strike the MTC on December 10, 2018, (Dkt. 133, 138), which the Court denied (Dkt. 144).

1783179

(Dkt. 152-1); and February 14, 2019, the afternoon of the day before this filing. Moreover, on January 22, 2019, counsel for TNWarranty and Plaintiffs spoke on the phone about these issues. (Dkt. 148, ¶¶ 5-6.) Although the parties substantially narrowed the scope of this dispute, Plaintiffs' productions and other discovery responses to date remain inadequate given the claims, defenses, and needs of the case.

4. In its February 1, 2019 letter, TNWarranty identified several remaining issues related to Plaintiffs discovery responses, made proposals to resolve these issues, and asked Plaintiffs to respond by February 4, 2019. (Dkt. 152-1.) Soon after, Ms. Oxley responded that Plaintiffs' in-house counsel "Randy Rings is in Cuba until Tuesday without [sic] very limited, if any, internet service. I'm not sure what we can tell you before then." (*See* email correspondence from D. Oxley to J. Petite and P. Mueller dated February 1, 2019, attached as **Exhibit A**.)

5. With a status report due Monday, February 4, and Rings not returning until Tuesday, February 5, counsel for TNWarranty asked Plaintiffs' counsel whether she consented to a "motion asking for another week to complete our meet and confer process." (*See id*., email correspondence from J. Petite to D. Oxley dated February 4, 2019.) Plaintiffs' counsel noted her limited availability due to a trial in another case but agreed to extend the parties' time to meet and confer. (*See id.*, email correspondence from D. Oxley to J. Petite dated February 4, 2019.)

6. As such, TNWarranty filed a status report and unresisted motion for additional time to meet and confer up to and until February 11, 2019, so that Plaintiffs' outside and in-house counsel, Mr. Rings, could prepare a substantive response. (Dkt. 152). The Court granted TNWarranty's motion. (Dkt. 153.) Plaintiffs, however, did not respond to TNWarranty's February 1 letter until February 14, just before TNWarranty's deadline for filing this Motion. (Dkt. 155-1.)

7.     Having heard nothing from Plaintiffs by February 11, 2019, TNWarranty contacted Plaintiffs about the status of their response.[3]  Plaintiffs did not reply.  TNWarranty thus filed a Motion for Leave to File Renewed Motion to Compel, seeking leave to either (1) renew its MTC, clarifying what issues remain in dispute, or (2) advise the Court that the parties had resolved their discovery dispute and withdraw the MTC ("Motion for Leave").  (Dkt. 155.)  By Order dated February 12, 2019, the Court granted the Motion for Leave.  (Dkt. 156.)

8.     As noted above, at 1:22 p.m. on Thursday, February 14, 2019, Plaintiffs transmitted a letter responding to TNWarranty's February 1, 2019 letter.  (A copy of Plaintiffs' February 14, 2019 letter is attached as **Exhibit B**.)  In it, Plaintiffs agreed to produce certain information, agreed to produce a witness to testify about their answer to Interrogatory No. 25 (but refused to reimburse TNWarranty for the costs and expense associated therewith), and made other concessions.  (*Id*.)  Because Plaintiffs did not respond to TNWarranty's February 1, 2019 letter until the cusp of TNWarranty's deadline for filing this Motion, TNWarranty was forced to finish preparing this Motion rather than devote time to further discussions with Plaintiffs.[4]  Because Plaintiffs have yet to produce the documents they agreed to produce, and because other issues are not conclusively resolved, TNWarranty files this Renewed Motion to Compel.  We address the unresolved issues below.

---

[3] By email dated February 11, 2019, TNWarranty's counsel advised Plaintiffs' counsel that "We have a status report due today and as yet Plaintiffs have not responded to our 2/1/19 letter on the remaining discovery disputes.  I know [Ms. Oxley] is running point for Plaintiffs on the meet and confer exercise, and that [she's] in trial through this week, so we're going to simply file another status report, stating that Plaintiffs have not responded to our 2/1/19 letter, and seeking leave to either file a renewed MTC by this Friday that will identify the outstanding issues that remain for resolution and the relief we're seeking, or advise the Court that the issues have been fully resolved." (Dkt. 155-1.)  TNWarranty further stated that "In the meantime, if Plaintiffs have a response to our 2/1/19 letter, such that we can further narrow or even eliminate the need for judicial intervention, please let us know." (*Id*.)

[4] As noted in its prior status reports on the MTC, TNWarranty understands that Ms. Oxley was in trial.

1783179

## ARGUMENT

I. ***Plaintiffs' claims and allegations that frame the discovery dispute regarding their financial, marketing and advertising documents***

9.     In this trademark infringement action, Plaintiffs allege that their marks are commercially strong and well-known throughout the United States in part because of Plaintiffs' sales revenue and marketing expenditures.  Specifically, Plaintiffs allege that:

   a.  "***TrueNorth has spent considerable resources developing and utilizing its TrueNorth mark and the two logo designs***. Since establishing the brand in 2001, TrueNorth has ***invested well over $30 million in marketing efforts*** to strengthen the TrueNorth brand, both locally and nationally." (Dkt. 132, Second Am. Compl. ¶ 14 (emphasis added).)

   b.  By virtue of ***extensive advertising and sales*** of its services thereunder, TrueNorth's marks have become well and favorably known to the public and have become valuable symbols of TrueNorth's business and goodwill. (*Id.* at ¶ 16 (emphasis added).)

   c.  Given the prominence of TrueNorth's use of its trademarks throughout the United States, Defendants had to have been aware of TrueNorth's use of its trademarks prior to Defendant's use of the TRÜNORTH mark and its design identified in paragraph 30.  (*Id.* at ¶ 66.)[5]

***TNWarranty's discovery directed at these core issues***

10.     Accordingly, on January 9, 2018, TNWarranty served its First Request for Production of Documents on Plaintiffs, which included the following requests directed at documents that would allow TNWarranty to test and defend against such allegations:

   a.  Documents sufficient to identify the annual gross revenues in units and dollars of each of your products or services sold under Your Marks. (RFP No. 45.)

   b.  For each of Your Marks, documents sufficient to identify the annual advertising and promotional expenditures for each of your products or services for each year of your existence, including but not limited to all documents relating to your claim and allegation that you have "spent well in excess of $30 million advertising [your] services and using [your] trademarks nationwide since 2001," and to identify the nature of those expenditures, and to show that expenditures on

---

[5] Plaintiffs' original complaint made the same allegations.  (Dkt. 2 at ¶¶ 14, 16, 57.)

and nature of your advertising and promotion of Your Marks and services in (a) the transportation industry; and (b) by geographic area or trade area. (RFP No. 46.)

c. All documents reflecting or concerning your audited, reviewed and/or compiled financial statements, for the period of 2012 through the date of your response hereto, including but not limited to income statements, balance sheets, and statements of cash flow. (RFP No. 47.)

d. All your internal (un-audited) monthly, quarterly and annual financial statements for the period of January 1, 2012 through the date of your response hereto, including but not limited to income statements, balance sheets, and statements of cash flow. (RFP No. 48.)

e. All financial reports, analyses, or other documents for the period of January 1, 2012 through the date of your response that report revenues, costs, assets, and liabilities by product line, service, or business unit. (RFP No. 49.)

f. Your state and federal tax returns for each year since 2011. (RFP No. 50.)

g. Produce all documents concerning the yearly dollar and unit volume of sales to date and projected future dollar and unit volume of sales for each of your products or services marketed or sold under Your Marks. (RFP No. 51.)

(*See* 133-3, Def.'s Req. Prod., hereinafter the "January RFP.")

11.     With Requests 45-51 of the January RFP, TNWarranty sought documents showing Plaintiffs' (1) revenue for products and services marketed under their marks, (2) sales of products and services marketed under their marks, and (3) advertising and marketing expenditures in promoting their marks. Prior to TNWarranty's MTC, Plaintiffs failed to produce any documents responsive to these requests, except for a lone three-page document showing a budget for 2017 and 2018 (Dkt. 133-5). (*See* Dkt. 133-3, Plaintiffs' Resp. to January RFP.)

12.     Plaintiffs have since ***partially*** cured these deficiencies by producing some tax returns, some financial statements, and some state-level commission documents. However, there remain gaps in Plaintiffs' production.

5

## II.    *Missing State-Level Commission Document.*

13.    Plaintiffs produced state-level commission documents for 2012 and 2014 through August 2018 but not for 2013.  Plaintiffs presumably do not object or have otherwise waived any objection to the production of such state-level commission documents because they already produced documents of this kind.  On February 1, 2019, TNWarranty noted this gap in the record and asked Plaintiffs to produce the missing 2013 state-level commission document.  (*See* Dkt. 152-1.)  On February 14, 2019, Plaintiffs indicated that "There was a problem with the 2013 state level data, and our client is working on finalizing the information for 2013 on a state-level basis.  This will be produced once it is finalized."  (*See* Exh. B.)  TNWarranty expects Plaintiffs will follow through on this promise; however, because it has not been produced as of today's deadline to renew the MTC, TNWarranty asks the Court to compel Plaintiffs to produce the missing 2013 state-level commission document.

14.    Furthermore, because this January 2019 production was Plaintiffs' first production involving revenue at the state level – despite Plaintiffs' assurances that it would produce state revenue documents in January 2018 – TNWarranty asked Plaintiffs to (1) confirm that this recent production represented the full extent of Plaintiffs documents involving state-level revenue, and (2) if not, explain the grounds on which they are being withheld. (Dkt. 152-1.)  Plaintiffs failed to address TNWarranty's request for clarification on this point in their February 14, 2019 letter.  (*See* Exh. B.)  Thus, TNWarranty further asks the Court to compel Plaintiffs to clarify whether this is the full extent of Plaintiffs' documents involving state-level revenue and, if not, allow TNWarranty the opportunity to seek further discovery on this issue.

6

III. *Unwarranted Redactions to Marketing Documents.*

15.     Although Plaintiffs improved their production with respect to advertising and marketing expenditures, they redacted some documents beyond comprehension and without adequate rationale. Specifically, Plaintiffs redacted headers from documents bates stamped TRUENORTH 4506-4570 (attached under seal as **Exhibit C**), which makes it impossible to determine what the data in the tables refers to. Plaintiffs assert they redacted the documents to obscure "partner identifiers," claiming that "break-out by partner is extremely confidential information that TrueNorth is not willing to provide absent a real need for it." (*See* letter correspondence from D. Oxley to J. Petite dated January 28, 2019, attached as **Exhibit D**.) TNWarranty tried to engage Plaintiffs in discussion regarding why partner-identifiers should be redacted, writing:

> Without the headers, [this marketing expenditure information] is useless because we cannot know what the numbers refer to. We do not understand why your concerns regarding "partner identifiers" are not allayed by the protection afforded by the HIGHLY CONFIDENTIAL designation. Partner identifiers are not redacted in the tax returns you produced. Please confirm by Monday, February 4 that Plaintiffs will reproduce these documents without redactions. (Dkt. 152-1.)

16.     Though they did not provide the requested confirmation, Plaintiffs finally stated in their February 14, 2019 letter:

> "[TNWarranty has] identified no need for [the redacted] headers to be un-redacted other than [its] claim that [it does] not know what the numbers referred to. However, as stated above, those reports were provided for purposes of responding to requests for documents showing marketing expenses, and the specific numbers associated with different partners has no potential relevance to marketing. TrueNorth will not further un-redact those marketing documents. (*See* Exh. B.)

17.     However, TNWarranty's need for these marketing expenditure documents is substantial, as they go to one of Plaintiffs' core allegations, *i.e.*, that their marks are

1783179

commercially strong and well-known in part because of Plaintiffs' sales revenue and marketing expenditure. Nowhere in their response do Plaintiffs explain why the protective order does not alleviate their concerns, nor do they articulate any harm that would befall them if they were produced in unredacted form under a HIGHLY CONFIDENTIAL designation. (*See* Exh. B.) Further, Plaintiffs did not redact partner-identifiers in their tax returns, which is both inconsistent and unnecessarily complicates TNWarranty's work in comprehensively reviewing and analyzing the financial documents in this case, presuming such a review is even possible without knowing what data corresponds to whom. Thus, TNWarranty asks the Court to compel Plaintiffs to reproduce the marketing documents without redactions under the HIGHLY CONFIDENTIAL designation.

IV. ***Refusal to Produce Known and Readily-Accessible Sales Documents.***

18. Despite some progress with respect to tax returns and certain revenue statements, Plaintiffs have failed to produce documents responsive to RFP 51, which seeks documents concerning sales to date *by product*. The full text of RFP 51, quoted above, is quoted again here for convenience:

> Produce all documents concerning the yearly dollar and unit volume of sales to date and projected future dollar and unit volume of sales for each of your products or services marketed or sold under Your Marks. (RFP No. 51.)

19. TNWarranty noted in its January 18, 2019 letter to Ms. Oxley that "Plaintiffs did not address RFP 51, which concerns sales data, in their January 8, 2019 letter and have not produced any responsive documents to date." (*See* letter correspondence from J. Petite to D. Oxley dated January 18, 2019, attached as **Exhibit E**.) Plaintiffs responded that "Given the nature of TrueNorth's products, it does not have reports that identify unit volume of sales by product." (*See* Exh D.)

20.     Although there may not be *reports* per se, it is clear that Plaintiffs have documents showing sales by product. To bolster their answer to Interrogatory No. 25,[6] Plaintiffs recently produced sales documents from their Epic and TSC Overdrive databases showing the type of product sold (*e.g.*, "O/O Non-Trucking Liability") (*See* excerpts from TRUENORTH 4490, filed under seal as **Exhibit F**; *see* excerpts from TRUENORTH 4491, filed under seal as **Exhibit G**.). These documents demonstrate that Plaintiffs have product-level sales data, as they produced a subset of that data to support their interrogatory answer purportedly related to truck dealer business relationship revenue (although TNWarranty contests what this actually shows). As TNWarranty explained and suggested in its February 1, 2019 letter:

> It appears that all Plaintiffs have to do is produce similar sales reports that cover all products sold under the mark. If additional calculations are required to derive total volume per product, we believe those can be computed, as you suggested we do with annual dealer-based referral revenue in your previous letter. (Dkt. 152-1.)

21.     RFP 51 is directed at documents concerning sales by product and revenue by product. This information is plainly available. (*See* Exh. F, Exh. G.) When TNWarranty said as much, Plaintiffs responded that "the Epic and TSC Overdrive databases . . . do not include ***all*** of Plaintiffs' revenues for products sold under its marks, but only those associated with sales through TrueNorth's client management system. Thus, a blanket report of all customers included in TrueNorth's client management databases would not be responsive to your request for sales by product." (*See* Exh. B (emphasis added).) A document or dataset need not be perfectly extent to the full bounds of a discovery request to fall within it. Sales tracked in Plaintiffs' client management system, while not representative of ***all*** sales, clearly show sales by product and are thus responsive to RFP 51.

---

[6] TNWarranty's concerns related to Plaintiffs' answer to Interrogatory No. 25, and its gross deviation from the testimony of Plaintiffs' corporate representative Chad Thurm, are discussed further, *infra*.

9

22.     Further, any claim that such documents are not proportional to the needs of the case rings hollow.  Plaintiffs exerted effort in producing a subset of the sales data tied to their supposed truck dealer business relationships.  Providing all Epic and TSC Overdrive sales data would have been far easier, as it would require little to no data manipulation.  TNWarranty requests the Court to compel Plaintiffs' to produce all documents responsive to RFP 51, including but not limited to the full Epic and TSC Overdrive datasets.

23.     TNWarranty's discovery requests are well within the permissible bounds of discovery.  "Rule 26 permits parties to 'obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case.'" *Hendrickson v. Fifth Third Bank*, No. 18-cv-86 (WMW/TNL), 2018 U.S. Dist. LEXIS 200991, *13–14 (D. Minn. Nov. 27, 2018) (quoting Fed. R. Civ. P. 26(b)(1)).  "Generally, Rule 26 is to be construed broadly and thus encompasses any matter that bears on, or that reasonably could lead to other matters that could bear on, any issues that is or may be in the case."  *McKey v. United States Bank Nat'l Ass'n*, No. 17-5058 (JRT/DTS), 2018 U.S. Dist. LEXIS 113396, *3 (D. Minn. July 9, 2018) (internal quotation marks omitted).  *See also Murray v. Marchbanks*, No. 4:16-CV-198 SNLJ, 2017 U.S. Dist. LEXIS 57358, *3 (E.D. Mo. Apr. 14, 2017) ("Relevancy is broadly construed, and a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party.").

24.     Rule 26(b)(1) of the Federal Rules of Civil Procedure provides:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed

> discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

*Nachurs Alpine Sols., Corp. v. Banks*, No. 15-CV-4015-LTS, 2017 U.S. Dist. LEXIS 104778, *
7-8 (N.D. Iowa July 7, 2017) (quoting Fed. R. Civ. P. 26(b)(1)) (emphasis added).

25.     The documents covered by the disputed requests are indisputably within this
liberal scope of discovery, in that they are relevant to any party's claim or defense because they
bear on the commercial strength of Plaintiffs' marks and their disgorgement remedy.  As Rule 26
explicitly states, information need not be admissible to be discoverable.   "The scope of
permissible discovery is broader … than the scope of admissibility."  *Nachurs Alpine Sols.*,
2017 U.S. Dist. LEXIS 104778, * 8-9 (citing *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380
(8th Cir.1992)).

26.     Plaintiffs' redacted marketing expenditure information and sales records clearly
satisfy Rule 26's relevance standard, as there is certainly a "possibility that they may be relevant
to" Plaintiffs' trademark infringement claims, and "encompass [a] matter that bears on, or that
reasonably could lead to other matters that could bear on, any issues that is or may be in the
case."   "In the likelihood of confusion context, the strength of the mark "consists of both
conceptual strength and commercial strength in the marketplace." *Roederer v. J. Garcia Carrion,
S.A.*, 732 F. Supp.2d 836, 864 (D. Minn. 2010) (citations omitted).  A "mark's commercial
strength or 'fame' is determined based on the 'public recognition and renown' of the mark as
evidenced by the extent of advertising, *sales volume*, features and reviews in publications, and
survey evidence." *Roederer*, 732 F. Supp.2d at 866–67 (quoting *Palm Bay Imports, Inc. v. Veuve
Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1374–76 (Fed. Cir. 2005)
(emphasis added).  Plaintiffs specifically allege in their Complaint that their marks are "well
known" because of the extent of Plaintiffs' sales volume.

11

27.     In addition, Plaintiffs are seeking the equitable remedy of disgorgement of profits. (Dkt. 132, Second Am. Compl. at 17.)  The Lanham Act provides that a disgorgement of profits is "subject to the principles of equity." *Getty Petroleum Corp. v. Island Trans. Corp.*, 878 F.2d 650, 655 (2d Cir. 1989).  The remedy of an accounting of profits has its "roots in equity," which means that it "is never automatic and never a matter of right."  *See* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* ("McCarthy") § 30:59, 30-162 (4th ed. 2017). Indeed, the Federal Circuit has pronounced that the remedy "is not automatic, and may be denied at the discretion of the district court, … where … careful examination of the record fails to reveal any specific evidence to the effect that a plaintiff has lost substantial business and profits as a result of defendant's unfair competition."  *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 919 (Fed. Cir. 1984).

28.     There is indisputably a "possibility that [the redacted marketing and withheld sales documents] may be relevant to" Plaintiffs' trademark infringement claims, and "encompass [a] matter that bears on, or that reasonably could lead to other matters that could bear on, any issues that is or may be in the case," in that such documents bear on the issue of whether Plaintiffs have lost substantial business and profits as a result of TNWarranty's alleged infringement and unfair competition.  *See* Fed. R. Civ. P. 26(b)(1).

29.     In addition, the requested marketing and sales records also go to Plaintiffs' equitable claims for an injunction and disgorgement of profits in support of which they allege that their reputation and good will has been harmed by TNWarranty's alleged infringement. "Good will is 'the value attributable to a going concern apart from its physical assets **--** the intangible worth of buyer momentum emanating from the reputation and integrity earned by the company.  A trademark or service mark is merely the symbol by which the public recognizes that

12

reputation and hence has no independent significance apart from the owner's good will.'" *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1350 (E.D.N.Y. 1994). In *Joe Hand Promotions, Inc. v. Fishers Bucks Seafood*, No. 90-7849, 1991 U.S. Dist. LEXIS 14750, 1991 WL 211646 (E.D. Pa. Oct. 16, 1991), the court concluded that a copyright plaintiff's financial information, including its tax returns, was discoverable because the plaintiff alleged damages "for loss of good will." The groundlessly redacted marketing documents and withheld sales documents go to this issue as well.

30.     TNWarranty's need for the redacted marketing documents and withheld sales documents is substantial: TNWarranty requires such documents to defend Plaintiffs' allegations as to commercial strength (*see* Dkt. 132, Second Am. Compl. ¶¶ 14, 16, 66) and potentially rebut any claim that Plaintiffs suffered any harm as result of the alleged infringement.

31.     Plaintiffs' objection that the requests are unduly burdensome trigger Rule 26's proportionality standard. "To determine whether the discovery requested is proportional to the needs of the case, courts consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Hendrickson*, *supra*, at *13 (quoting Fed. R. Civ. P. 26(b)(1)). Here, the requested discovery goes to the very heart of the case: the likelihood of confusion analysis and the multi-million monetary remedy Plaintiffs are seeking. Consequently, these issues are of critical importance to the issues at stake in the action, the amount in controversy is substantial, and the discovery is of profound importance in resolving the issues in this case.

32.     Plaintiffs clearly have ready access to the requested documents and the likely benefit of the discovery dwarfs whatever minimal burden or expense is associated with producing the requested documents.  With respect to the redacted marketing documents, Plaintiffs already produced some of them so they are clearly available and ready to be produced in their original form, and with respect to the sales documents, Plaintiffs already expended extra effort to create a curated subset of documents to suit their purposes, when they could have produced the requested sales information with far less effort.  Such documents are proportional to the needs of the case.

33.     In addition to their unsubstantiated and meritless proportionality objections, Plaintiffs further object to Request 51 of the January RFP for vagueness.  (Dkt. 133-3, Resp. # 51, at 13.)  Request 51 seeks "documents concerning the yearly dollar and unit volume of sales to date and projected future dollar and unit volume of sales for each of your products or services marketed or sold under [Plaintiffs'] Marks."  (*Id.*)  There is nothing vague about this very specific request.  Plaintiffs have already produced product-level sales data related to supposed truck dealer business relationships, which shows that they not know what it is but also know how to dissect it.

34.     To the extent Request 51 is vague and TNWarranty is required to clarify, documents responsive to this request might include: sales forecasts (annual, quarterly, or monthly); sales projections; sales models; sales quotas or targets for employees or independent contractors; marketing or business plans that contain sales figures, expressed either monetarily or in terms of units sold.  Without the sales documents, TNWarranty cannot marshal a central defense related to the commercial strength of Plaintiffs' mark or adequately defend against Plaintiffs' disgorgement of profits demand.

V. **Unresolved issues regarding Plaintiffs' Answer to Interrogatory No. 25 and related discovery likewise directed at whether and to what extent the parties' respective trade channels overlap.**

35.     On October 3, 2018, Plaintiffs produced Chad Thurm ("Thurm"), the Senior Vice President of TrueNorth's Transportation Division with "general operations oversight for the transportation division[.]" (Transcript of Deposition of Chad Thurm ("Thurm Dep.") (excerpts of which are attached as **Exhibit H**), 31:24-32:15). Plaintiffs had designated Thurm to testify under Rule 30(b)(6) on, among other things, the Plaintiffs' "customer base and/or customers in the Transportation Industry;" "[t]he identities of the persons with whom you compete in the Transportation Industry and the markets or submarkets in which you compete in the Transportation Industry;" "marketing to the Transportation Industry under your Marks" (*id.* at 22:14-27:6).

36.     Thurm testified that TrueNorth does not compete with TNWarranty. (*Id.* at 126:1-7.)

37.     Thurm was also designated to testify about TrueNorth's relationship with Lone Mountain Truck, LLC ("Lone Mountain"). (*Id.* at 31:1-5.)

38.     Thurm testified that Lone Mountain sells both new and used commercial trucks. He also testified:

> Q:     Okay. All right. And are there other – does TSC have relationships with other firms like Lone Mountain?
>
> A:     They do, but Lone Mountain would be the largest. I'm not familiar with the names of others.
>
> Q:     Do you know any other firms like Lone Mountain that TSC does business with?
>
> A:     I know there may be a couple. I don't know the names though.

(*Id.* at 102:25-103:9.)

15

39.     When asked about TrueNorth's "channels of trade" (*id.* at 152:15-18 ("can you identify for me the channels of trade through which TrueNorth's transportation division markets its products and services?"), Thurm testified that TrueNorth has "target[ed] used commercial truck dealers" (*id.* at 153:21-154:4), but reiterated, when TNWarranty's counsel noted that "we talked about this earlier" (*id.* at 155:8-9), that Lone Mountain Leasing "is the only used commercial truck dealership" that Thurm was aware of "that TrueNorth does business with" (*id.* at 155:10-13).

40.     Thurm also testified that TrueNorth does not sell any consulting services to used commercial truck dealers.  (*Id.* at 135:22-136:10.)

41.     About two (2) weeks later, on October 18, 2018, TNWarranty took the deposition of Jacob Pipkin ("Pipkin"), who was not a Rule 30(b)(6) designee on any topic.  Pipkin, TrueNorth's Transportation Team Leader (Transcript of Deposition of Jacob Pipkin ("Pipkin Dep.") (excerpts of which are attached as **Exhibit I**), 11:9-14), was asked how many "commercial truck dealers" – the question was not limited to *used* commercial truck dealers – TrueNorth's Transportation Division has a business relationship with:

> Q. Okay. How many commercial truck dealers does TrueNorth's transportation division have a business relationship with?
>
> A. I don't have that answer off the top of my head. It's dozens.
>
> Q. All right. Is that less than or fewer than 50?
>
> A. I would say in some capacity or another, probably pretty close to 50.

(Pipkin Dep. 68:15-23.)

42.     Accordingly, TNWarranty's counsel asked a follow-up question to determine how many of those 50 dealers were used commercial truck dealers:

> Q:     Would all of those commercial truck 9 dealers also sell used commercial trucks?

16

A:    Some of those truck dealers may sell new only, some may sell used only, and some may sell a mixed capacity between new and used equipment.

(Pipkin Dep., 70:8-13.)

43.    Given Thurm and Pipkin's testimony, TNWarranty propounded, on October 16, 2018, Interrogatory No. 25, in which TNWarranty sought a definitive answer on this issue and asked Plaintiffs to:

> For the time period January 1, 2015 to the date of your response hereto, identify all used commercial truck dealers with whom your Transportation Division has done and does business and for each such dealer (including any affiliates or companies under common control of or by the dealer) state the annual gross and net revenue your relationship has generated during that time period.

(*See* Def.' Second Interrog., Interrog. No. 25, attached as **Exhibit J**.)

44.    With Interrogatory No. 25, TNWarranty was seeking two things (a) to require Plaintiffs to provide information they already should have provided in their earlier answers to TNWarranty's Interrogatory Nos. 4 and 5, and No. 7 of TNWarranty's First Set Interrogatories, which asked Plaintiffs to specifically identify the products and services they sold under their marks, to specifically identify each channel of trade in which they sold particular products and services, to state the dates they provided those products and services in those channels, and to state the revenue associated with those sales by channel (Dkt. 133-2, Interrog. No. 4-5, 7, at 8-11, 14); and (b) to clarify Thurm and Pipkin's testimony with specifics regarding TrueNorth's presence in the used commercial truck dealer channel of trade.

45.    In their answers to the First Interrogatories, which they served in January 2018, Plaintiffs never identified used commercial truck dealers as a channel of trade and never identified the products and services Plaintiffs sell to used commercial truck dealers. (Dkt. 85-8.) Again, Thurm, Plaintiffs' Rule 30(b)(6) designee on the matter, testified that Plaintiffs sold

17

insurance products to at most only three (3) used commercial truck dealers – Lone Mountain and perhaps a "couple." (Thurm Dep., 102:14-103:9.) When Pipkin testified vaguely about others, TNWarranty served Interrogatory No. 25.

46. Plaintiffs served their answer to Interrogatory No. 25 on December 14, 2018. (A copy of Plaintiffs' answer is attached under seal as **Exhibit K**.) Their initial answer is confusing and is especially less than clear about the nature of TrueNorth's business relationship with commercial truck dealers. After issuing a boilerplate objection, Plaintiffs initially answered TNWarranty's Interrogatory No. 25 as follows:

> Used truck dealers and financing companies with which Plaintiffs have a business relationship are listed in HIGHLY_CONFIDENTIAL-TRUENORTH_2300-2305. Revenues as generated by the business relationships with used truck dealers from January 1, 2015 to November 30, 2018 are set forth in HIGHLY_CONFIDENTIAL-TRUENORTH_2306.

47. TRUENORTH_2300-2305 and TRUENORTH_2306 are attached under seal as **Exhibit L**. At TNWarranty's request, Plaintiffs produced the information behind the revenue figures. (*See* Exh. G; Exh. H.)[7]

48. In assessing it, TNWarranty found more questions than answers. Specifically, in TRUENORTH_2300-2305, Plaintiffs' list forty-seven (47) supposed truck dealer business relationships.[8] At his deposition, Thurm named only one used commercial truck dealer with whom TrueNorth did business. Although Pipkin testified vaguely about others, he gave no real specifics. Nonetheless, Plaintiffs would later produce TRUENORTH_2300-2306, which alleged

---

[7] TNWarranty's request was based on other pending document requests. Specifically, to the extent Plaintiffs relied on any documents to answer Interrogatory No. 25, those documents would be responsive to TNWarranty's RFP 57, in which TNWarranty sought documents used by Plaintiffs to answer interrogatories, and must therefore be produced as well. Furthermore, any underlying financial documents on which Plaintiffs' answer to Interrogatory No. 25 would be based are independently responsive to TNWarranty's RFP 51 (*see supra*).

[8] Some of the companies Plaintiffs identified appear to be not commercial truck dealers, but finance companies, and even for those that appear to commercial truck dealers, Plaintiffs have not identified which of the dealers are used as opposed to new truck dealers.

18

1783179

forty-seven (47) truck dealer business relationships and revenue figures related to them that were purportedly in the millions over a nearly four (4) year period. Thus, Plaintiffs' answer to Interrogatory No. 25, and further supplemental answer represent a radical departure from Thurm's prior testimony. (A copy of Plaintiffs' supplemental answer is attached under seal as **Exhibit M**.)

49.     In its meet and confer letters, TNWarranty asked a series of follow-up questions, but again the answers were less than illuminating.

50.     Because this is the first time in this case that they have provided any specifics that purport to contradict Thurm's sworn testimony and their sworn March 2018 interrogatory answers, TNWarranty asked Plaintiffs to designate and produce a corporate designee to testify regarding the conflicting supplemental answer. (Dkt. 152-1.) Furthermore, TNWarranty asked Plaintiffs to cover TNWarranty's deposition fees and expenses. (*Id.*)

51.     In their February 14, 2018 letter, Plaintiffs agreed to produce a witness to testify about their answer to Interrogatory No. 25, but have refused to bear the costs and expenses associated with that deposition. (*See* Exh. B.) Thus, TNWarranty asks the Court to compel Plaintiffs to produce a corporate designee on this topic and to pay for TNWarranty's reasonable fees and expenses incurred not only in bringing its MTC and this Renewed Motion to Compel, but also in taking the deposition.

52.     In *CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*, 322 F.R.D. 350 (N.D. Iowa 2017), the court held that a "court may levy 'appropriate sanction[s] for a corporation's inadequate designation" in response to a Rule 30(b)(6) notice." *Id.* at 361 (citing *Cedar Hill Hardware & Constr. Supply, Inc. v. Ins. Corp. of Hannover*, 563 F.3d 329, 345 (8th Cir. 2009), and Fed. R. Civ. P. 30(d)(2)). Under Rule 30, Plaintiffs were required to "make a conscientious,

good-faith effort to designate knowledgeable persons . . . and to prepare them to fully and unevasively answer questions about the designated subject matter."

53. Here, TNWarranty asked for detailed information regarding TrueNorth's channels of trade in December 2017. (*See* Dkt. 133-2, Interrog. No. 4-5, 7, at 8-11, 14.) Plaintiffs' January 2018 interrogatory answer failed to disclose that TrueNorth operated in the used commercial truck dealer channel. (*Id.*) To confirm that Plaintiffs did not operate in that channel of trade, TNWarranty served a Rule 30(b)(6) notice of deposition on July 24, 2018, about six weeks after hearing nothing in response to a June 8, 2018 email TNWarranty's counsel sent opposing counsel asking Plaintiffs to provide witnesses and dates for a Rule 30(b)(6) deposition that would include a topic regarding TrueNorth's channels of trade. (*See* email correspondence from J. Petite to M. Zaiger dated July 24, 2018, attached as **Exhibit N**; *see* email correspondence from J. Petite to M. Zaiger dated June 8, 2018, attached as **Exhibit O**.)

54. Over the ensuing weeks, TNWarranty's counsel continued to request witnesses and dates for a Rule 30(b)(6) deposition of Plaintiffs. (*See* email correspondence from J. Petite to M. Zaiger dated June 29, 2018, attached as **Exhibit P**; *see* email correspondence from J. Petite to M. Zaiger dated July 20, 2018, attached as **Exhibit Q**.)

55. Finally, on September 13, 2018, more than three (3) months after TNWarranty first requested deposition dates, and nearly two (2) months after TNWarranty served its Rule 30(b)(6) deposition notice, Plaintiffs identified the witnesses they were designating to testify on their behalf and provided some possible dates. (*See* email correspondence from M. Zaiger to J. Petite dated September 13, 2018, attached as **Exhibit R**.) Consequently, Plaintiffs did not produce a corporate designee witness on their channels of trade until October 3, 2018. (*See* Thurm Dep.)

56.     That witness, Thurm, testified that at most TrueNorth did business with three used commercial truck dealers, testimony that contradicted Plaintiffs' sworn interrogatory answers which did not identify any such dealers or even that Plaintiffs did business in that channel of trade. (Thurm Dep., 102:14-103:9.)

57.     Plaintiffs then contradicted their corporate designee witness's testimony via their answer to Interrogatory No. 25, which asks Plaintiffs to "identify all used commercial truck dealers with whom [their] Transportation Division has done and does business" during the "period January 1, 2015 to the date of [their] response," by claiming that they do business with approximately 40 commercial truck dealers of one kind or another. (*See* Exh. M, Exh. L.) At best, Plaintiffs answer to Interrogatory No. 25 demonstrates that Thurm was inadequately prepared to testify about TrueNorth's channels of trade and its customers in those channels.

58.     Plaintiffs' ever-changing, vague, and confusing sworn answers and testimony on this issue have necessitated the taking of a deposition on it, so TNWarranty can finally get a straight answer to this core issue in the case. Because Thurm was at best inadequately prepared by Thurm for his Rule 30(b)(6) deposition, the Court "may levy appropriate sanctions." *CMI Roadbuilding*, 322 F.R.D. at 361.

## VI. Plaintiffs should produce the financial documents of their sibling company, TSA, since Plaintiffs control those documents.

59.     In its February 1, 2019 letter, TNWarranty specifically pressed Plaintiffs for documents reflecting two of its divisions, TrueChoices, and Truckers Service Company: "Also, it is our understanding that Plaintiffs track revenue/expense data for particular divisions or segments, such as TrueChoices, and Truckers Service Company, both of which are listed along with Transportation as divisions in your company directory.  Please produce such data for the period 2013 to the present." (Dkt. 152-1.)

60.     To ensure that TNWarranty has a complete and accurate financial picture (sales revenue and marketing expenditures) for Plaintiffs' division Truckers Services Company, TNWarranty "also ask[ed] that Plaintiffs produce financial statements and tax returns for Truckers Service Association (TSA) for the period 2013 to the present, as it was made clear by Mr. Rings' testimony and the exhibits associated therewith that TSA is an entity controlled by Plaintiffs."  (*Id.*)  TSA is the de facto surrogate of Plaintiffs' Truckers Services Company division and is the entity through which Plaintiffs market their products to independent truckers under the TSA, TrueChoices and Independent Advantage brands.  (*See* Transcript of Deposition of Randall Rings ("Rings Depo"), attached as **Exhibit S**, 40:11–59:12, and Deposition Exhibit 124, attached as **Exhibit T**.)  TSA shares the same corporate headquarters address as Plaintiffs and members and senior management officers of the Plaintiff LLCs are board members and senior management officers of TSA.  (*Id.*)

61.     In their February 14, 2019 letter, Plaintiffs objected, claiming that TSA was not an affiliate and that "the fact that there is overlap of board members does not authorize TrueNorth to provide financial information from TSA as part of this lawsuit."  (*See* Exh. B.)

Plaintiffs indicated, however, that "If you want to subpoena TSA for those records from TSA, TrueNorth would not object on the basis of being outside the discovery period." (*Id.*)

62.     TNWarranty should not have to subpoena an entity that, as shown by Rings' testimony, is controlled by Plaintiffs.  Moreover, even with Plaintiffs' commitment that they will not object to a document subpoena, TSA might do so.  Plaintiffs have a duty to produce documents in their "possession, custody *or control*."  Fed. R. Civ. P. 34(a)(1) (emphasis added).  In *FDIC v. Dosland*, No. C13-4046-MWB, 2014 U.S. Dist. LEXIS 46567 (N.D. Iowa Apr. 4, 2014), the court held that materials are deemed to be within the possession, custody or control for purposes of Rule 34 "if the party has actual possession, custody or control, or has the legal right to obtain the documents on demand."  *Id.* at *13 (quoting *Prokosch v. Catalina Lighting, Inc.*, 193 F.R.D. 633, 636 (D. Minn. 2000)).  "For purposes of Rule 34, '[a] party does not need to have legal ownership or actual possession of documents, 'rather documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action.'"  *Id.* at * 13-14 (quoting *New Alliance Bean and Grain Co. v. Anderson Commodities, Inc.*, No. 8:12-cv-197, 2013 U.S. Dist. LEXIS 64437, 2013 WL 1869832, at *3 (D. Neb. May 2, 2013).  *See also Securities & Exchange Commission v. Credit Bancorp*, 194 F.R.D. 469, 472 (S.D.N.Y. 2000) (surveying case law and noting that, applying the legal right test, courts have found control by a parent corporation over documents held by its subsidiary and vice-versa, as well as control by one sister corporation over documents held by another sister corporation).  Because Plaintiffs control the documents in their sibling TSA's possession, and share officers, board members, and a corporate address with TSA, they should be compelled to produce those documents.

1783179

**WHEREFORE** Defendant TNWarranty respectfully requests the Court issue an order (1) granting this Motion; (2) compelling Plaintiffs to produce documents responsive to the requests for production described herein; (3) compel Plaintiffs to produce a corporate designee on the issue of Plaintiffs' answer and supplemental answer to Interrogatory No. 25 and its business relationships with used commercial truck dealers; (4) award TNWarranty its reasonable costs and fees and expenses incurred not only in bringing its MTC and this Renewed Motion to Compel, but also in taking the corporate designee deposition and, and (5) for other such relief as the Courts deems just and proper.

Respectfully submitted,

Michele L. Brott AT0010068
Sharon Malheiro AT0004936
**Davis Brown Law Firm**
215 10th Street, Suite 1300
Des Moines, IA 50309
Telephone: 515-288-2500
E-mail: MicheleBrott@davisbrownlaw.com
SharonMalheiro@davisbrownlaw.com

John E. Petite, *pro hac vice*
**Greensfelder, Hemker & Gale, P.C.**
10 South Broadway, Suite 2000
Saint Louis, Missouri 63102
Telephone: (314) 241-9090
E-mail: jep@greensfelder.com

**ATTORNEYS FOR DEFENDANT
TRÜNORTH WARRANTY PLANS OF
NORTH AMERICA, LLC**

24

Copies to:

Mark Zaiger
Brett D. Papendick
Dana L. Oxley
Shuttleworth & Ingersoll, PLC
115 3rd Street SE, Suite 500
PO Box 2107
Cedar Rapids, IA 52406
Telephon: 319-365-9461
mlz@shuttleworthlaw.com
bdp@shuttleworthlaw.com
dlo@shuttleworthlaw.com

**ATTORNEYS FOR PLAINTIFFS**

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on February 15, 2019 by:

☐ U.S. Mail          ☐ FAX
☐ Hand Delivered     ☐ Email
☐ Federal Express    ☒ Other: CM/ECF

Signature:_____